# Haines *v.* Roberts, Appellants.

*Evidence—Custom—Slate quarry lease—Royalties—Mines and mining.*

Where a lease for the operation of a slate quarry provides that the lessees shall pay for "all slate mined and manufactured by them, including every description of material taken and sold from said demised premises, a royalty of eight per cent," and the lease further provides for the payment of such royalty on a specified day in each month, the terms of the lease as to the payment of royalties are not ambiguous; and evidence is not admissible of a custom prevailing in the district by which royalty was calculated on prices at which the slate sold at the quarry, plus what it would have cost to deliver the same at a railroad station some distance away; and all the more is such evidence inadmissible where the witnesses called to prove the custom could not state that the leases of other quarries where they alleged the custom prevailed were identical in terms with the lease in question.

Argued Dec. 2, 1913. Appeal, No. 21, Oct. T., 1913, by defendants, from judgment of C. P. Lehigh Co.,

April T., 1911, No. 81, on verdict for plaintiffs in case of A. S. Haines et al. v. Michael J. Roberts et al. Before RICE, P. J., HENDERSON, ORLADY, HEAD and PORTER, JJ. Reversed.

Assumpsit for royalties. Before TREXLER, P. J.

The material portions of the lease in question were as follows:

"That the said lessor for and in consideration of the payments to be made and of the covenants, conditions and agreements hereinafter mentioned to be kept and performed on the part of the said lessees their heirs and assigns hath and by these presents doth give, grant, demise and lease unto the said lessees their heirs and assigns the exclusive right, liberty and privilege of entering at all times for and during the period of fifteen (15) years from the date hereof with privilege of having the same extended by and with the consent of the said lessor, his heirs and assigns, in, on and upon all that certain tract of land situate in the Township of Washington, county and state aforesaid. And with agents, laborers and teams to search for, dig, excavate, mine, manufacture and carry away therefrom the slate now found in, upon or under the said described land and during the continuance of this lease the said lessees their heirs and assigns shall have the right and privilege to remove any and all slate mined and manufactured by them. In consideration whereof the said lessees their heirs and assigns covenant, promise and agree to and with the said lessor, his heirs and assigns to pay the rent and royalty as follows: On all slate mined and manufactured by them including every description of materials taken and sold from said demised premises a royalty of eight (8) per cent. which royalty shall be treated as rent. The measurements of all flagging and factory stones to be taken at the quarry. All of said royalties shall be paid monthly on or before the 20th day of each and every month for all sales made during

the preceding month. And for the purpose of ascertaining the quantity of materials quarried and sold from said demised premises the said lessor or his authorized agent shall have the right and privilege of entering at all reasonable times upon the demised premises and the books of the said lessees their heirs and assigns shall also at all reasonable times be open to the said lessor or his authorized agent and should any willful frauds be discovered this lease shall be declared null and void. The said lessees their heirs and assigns shall also on or before the tenths of each and every month furnish to the said lessor his heirs and assigns a statement in detail of all slate sold during the preceding month, and every three months, viz.: On the first day of each of the following months: January, April, July and October a complete stock account of all slate then remaining on the bank."

The plaintiffs claimed that the royalty should be calculated on prices at which the slate sold at the quarry plus what it would have cost to deliver the same at the railroad station at Slatington about a quarter of a mile from the quarry. To sustain this claim the plaintiffs offered evidence of a custom which prevailed in the district as to such calculation of royalties.

When A. O. Rice, a witness for the plaintiff, was on the stand he was asked this question:

"Q. What is the custom?" Mr. Diefenderfer objects to the witness answering that question for the reason that he has stated that he does not know the provisions of the leases and also having stated that the provisions of the leases are different, and that therefore this testimony is incompetent and irrelevant.

The Court: Objection overruled and bill sealed for defendants. [9]

"A. As far as I know it is f. o. b. cars quarry at Slatington."

Wm. Roberts, a witness for defendants, was asked this question:

Defendant proposes to prove by the witness that a large portion of the product of the quarry for which royalty is now claimed was sold upon the bank at the quarry and not loaded on cars, and that the price of the slate so sold from the bank is the price which the defendants received for it, and that there was no deduction from such sales for hauling or any other purpose.

Defendants further propose to prove by the witness that in all their dealings as to the sale of slate, the price was in each instance fixed on the bank of the quarry, and that all the books and accounts of the defendants during all the time that they operated under the lease show that all the slate quarried and taken from the demised premises was sold by them and entered into their books and accounts at the price on the bank, and that whatever slate was loaded on cars was paid for extra by the purchaser as hauling and was charged in all the accounts of the defendants. This testimony to be followed by the offer of the defendants' books in evidence.

Objected to by plaintiff as incompetent and irrelevant, and especially for reasons already stated.

The Court: The royalty bills or accounts sent to the plaintiffs by the defendants are admittedly upon the basis of the price upon the bank of the quarry and not f. o. b. cars. The plaintiffs must recover either the amount he claims by proof that the custom was that the royalty must be based upon the price f. o. b. cars. If the jury find that the lease is not to be construed in that way plaintiffs' entire case falls, and it is not necessary for it to discriminate between the slate that was shipped by car and which was taken from the quarry directly.

The other points in the proposition have already been passed upon by the court. The proof of dealings between the parties would be evidence, but there is nothing new developed in this point that the court can see, and the point fails to bring home notice to the plaintiffs

of this course of dealing. The objection is sustained, bill sealed for defendants. [10]

Verdict and judgment for plaintiffs for $132.56. Defendants appealed.

*Errors assigned* among others were (1) refusal of binding instructions for defendants and (9, 10) rulings on evidence, quoting the bill of exceptions.

*P. K. Erdman*, with him *Thos. F. Diefenderfer*, for appellants, cited:—E. Enamel Co. v. G. S. Fire Ins. Co., 45 Pa. Superior Ct. 550; Glenn v. Strickland, 21 Pa. Superior Ct. 88; Standiford v. Kloman, 234 Pa. 443.

*Frank Jacobs*, for appellees.

OPINION BY PORTER, J., July 15, 1914:

The plaintiffs brought this action to recover a balance alleged to be due them as royalty under the covenants of a lease for the operation of a slate quarry. The defendants had paid to the plaintiffs the full amount of the royalty, at the rate stipulated in the lease, calculated on the price received for the manufactured product on the quarry bank. The quarry was situated over a quarter of a mile from the nearest railroad siding and it was admitted in this case that the price at the quarry bank was ten cents per square of slate below the amount which the same slate was worth f. o. b. cars at the railroad siding. The plaintiffs assert that, under a custom prevailing among the quarries of that region, they are entitled to the royalty upon this ten cents per square without regard to whether the defendants ever realized that amount from the sale of the slate. They contend that this custom, no matter what the terms of the written lease may be, entitles them to royalty on this ten cents per square when the defendants sold the slate at a given price on the quarry bank and the purchaser agreed to pay ten cents additional per square for hauling the slate

to the cars and the defendants paid to third parties the same amount per square for doing the hauling and loading on the cars. They go even further and claim that when the defendants sold slate at a fixed price on the quarry bank and the purchaser himself took the slate away from the quarry, the defendants having nothing to do with the hauling and receiving nothing for it, that the defendants must still pay royalty on the ten cents per square which it would have cost to transport the slate to the cars, although the defendants never received the money and the slate was never taken to the cars. The plaintiffs produced testimony which it was thought tended to establish the existence of such a custom in that region and the court below having submitted the question to the jury, the result was a verdict and judgment in favor of the plaintiffs and the defendants appeal.

The learned judge of the court below admitted evidence as to the existence of the alleged custom, basing his ruling upon the ground that the meaning of the written lease was ambiguous. The earnestness and ingenuity of counsel for the appellees resulted in confining the inquiry in the court below to a single covenant of the lease. The lease gave the lessees, the appellants, the exclusive right to mine for slate on a tract of land and to manufacture the slate on the premises, during a definite period, "and during the continuance of this lease the said lessees, their heirs and assigns, shall have the right and privilege to remove any and all slate mined and manufactured by them." The lessees upon their part covenanted: "In consideration whereof the said lessees, their heirs and assigns, covenant, promise and agree to and with the said lessor, his heirs and assigns, to pay the rent and royalty as follows: On all slate mined and manufactured by them including every description of material taken and sold from said demised premises a royalty of eight (8) per cent, which royalty shall be treated as rent." The inquiry in the court

below seems to have been limited to these two sentences quoted from the lease and the entire argument for the appellees in this court is based upon them. If this had been all that the lease contained it might have been proper to conclude that it was ambiguous. It does not in these sentences clearly appear whether the royalty was to be paid in kind, that is, in manufactured slate, or in money, and there is no time fixed for the payment. But the lease contains other provisions which clear up any seeming ambiguity, for following the covenants above quoted we have the following: "The measurements of all flagging and factory stones to be taken at the quarry. All of said royalty shall be paid monthly on or before the twentieth day of each and every month for all sales made during the preceding month. And for the purpose of ascertaining the quantity of materials quarried and sold from said demised premises the said lessor or his authorized agent shall have the right and privilege of entering at all reasonable times upon the demised premises and the books of the said lessees, their heirs and assigns, shall also at all reasonable times be open to the said lessor or his authorized agent and should any willful frauds be discovered this lease shall be declared null and void. The said lessees, their heirs and assigns, shall also on or before the tenth of each and every month furnish to the said lessor, his heirs and assigns, a statement in detail of all slate sold during the preceding month, and every three months, viz.: on the first day of each of the following months: January, April, July and October a complete stock account of all slate then remaining on the bank."

The covenants of the lease, taken altogether, clearly define the rights, duties and obligations of the lessees. They were to mine the slate and manufacture it on the premises. It was the product of these operations upon which they were to pay royalty. They were not required to transport the manufactured product to market. The lessor, to whose rights these appellees have suc-

ceeded, was not to receive his royalty in kind, that is, in manufactured slate; the lessees were to sell the whole product and the lessor was to receive as rent, in money, eight per cent of the amount realized from the sale. This lease did not constitute the lessor and the lessees partners, the lessor did not assume any of the risks of the business, nor did he take any chances as to the collection of the money for which the slate was sold. If the lessees in the conduct of their business found it necessary to make contracts to deliver slate at Slatington, Philadelphia or Chicago all the risks of that transportation would be upon the lessees. When the slate in pursuance of a contract of sale left the quarry bank, it was as between the lessor and lessees, under the provisions of this lease, to be considered as sold. The lessees were to furnish every month a statement in detail of all slate sold during the preceding month, and every three months "a complete stock account of all slate then remaining on the bank." It thus clearly appears that slate was to be considered sold when removed from the bank of the quarry. Under the provisions of this lease the lessor assumed none of the risks of transportation and he was not entitled to royalty upon the cost thereof.

"Where a word with a special meaning or a trade phrase appears in a contract, it is competent, if justice so requires, to introduce evidence to show the real sense in which such word or words were used, or, in a proper case, that they have a generally known fixed trade significance; for the theory is that when a trade meaning of this character is established, the parties are presumed to have contracted with a view and in relation thereto, as much as though the special meaning of the words were expressed at large. But where a word has a common or generally accepted ordinary meaning it is supposed to have been so intended, unless it be plain from the context or is properly made to appear that the word was used in some other sense:" Roylance Co. v. Descalzi, 243 Pa. 184. The appellees did not in the

present case attempt to explain the words used in connection with the subject-matter of the contract by proof that the words used in this lease had a generally recognized particular meaning in the business with regard to which the parties were contracting. The language of the lease makes good sense when the words are given their ordinary meaning and it does not import a trade phrase, nor is it equivocal.

The testimony relied upon by the appellees, in order to establish a local custom, did not raise any question of a latent ambiguity in the lease. Had there been any question as to the meaning of the term "manufactured slate" or "quarry bank," it would have been proper to admit evidence as to the meaning of those terms in the business, but no question of that kind arose. The only question in the case turned upon the interpretation of a written instrument. The testimony produced by plaintiffs in support of their assertion that they were entitled to recover under a local custom tended to establish the following facts: There are about thirty-five slate quarries in the Slatington district and more than half of them are operated under written leases. Those leases vary in their covenants, and there was no evidence in this case from which any jury should have been permitted to infer that any two of the leases contained similar covenants, or that any other lease was identical in its terms with that with which we are now dealing. No witness attempted to state the covenants of any of the leases. No lease other than that between these parties was offered in evidence in the case. Some of the quarries abut directly upon the railroad track and have sidings connected therewith. No one of the witnesses had even read more than four of the other leases. The witnesses testified that the lessees under those other leases paid royalty upon the basis of the price of the slate free on board cars. This testimony may have been all true and yet those other leases may have specifically covenanted that the royalty should

be computed upon the basis indicated. This evidence was wholly insufficient to warrant the submission to the jury of the question of the existence of a custom, in the light of which these parties must be presumed to have contracted in 1903, which should be read into the written contract they actually made, and so vary its terms: Watson v. Blaine, 12 S. & R. 131; Adams v. Pittsburg Insurance Co., 76 Pa. 413; Standiford v. Kloman, 234 Pa. 443; E. Enamel Co. v. G. S. Fire Insurance Co., 45 Pa. Superior Ct. 550. The learned judge of the court below, being of opinion that the only question was as to the existence of the alleged custom, logically overruled offers of the defendants to prove that the prices stated in their returns to the lessor upon which they had already paid royalty were the prices at which the slate was sold; that the prices at which they quoted slate were at the quarry; that in those cases in which they hauled slate to the railroad the price at the quarry and the charge for the hauling were kept distinct and separate; that defendants did not themselves deliver slate but that they had a standing contract with other parties for hauling to the siding and paid those parties ten cents per square for the hauling; and that a large portion of the product of the quarry was sold upon the bank of the quarry at a fixed price, which was all that the defendants received for it, and that the purchasers made their own arrangements with regard to the hauling. The result was that the plaintiffs were permitted to recover royalty at the rate of eight per centum upon ten cents per square of all the slate that the defendants have manufactured during a period of several years, without regard to whether the defendants ever received that ten cents per square or not. This recovery has for its only foundation the alleged custom. The plaintiffs produced no evidence tending to show how much slate the defendants had actually sold free on board cars, and by their objection they prevented the defendants from showing the amount of slate which had been sold on the bank

of the quarry and the amount which had been sold free
on board cars.   There was, therefore, no evidence from
which a jury could find how much of the slate had really
been taken from the quarry to the railroad.   The assign-
ments of error are sustained.

The judgment is reversed.